St. Mary's Hospital and another, Appellants, vs. Industrial Commission and another, Respondents.*

*June 9—June 30, 1950.*

* Motion for rehearing denied, with $25 costs, on September 6, 1950.

412

For the appellants there was a brief by *Schubring, Ryan, Petersen & Sutherland* of Madison, and oral argument by *William Ryan.*

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the respondent Dorothy Lockhart (Althaus) there was a brief by *Hill, Beckwith & Harrington,* attorneys, and *D. V. W. Beckwith* and *William L. McCusker* of counsel, all of Madison, and oral argument by *Mr. Beckwith* and *Mr. McCusker.*

FRITZ, C. J.    In findings and an interlocutory award of compensation made after a hearing before two examiners of the Industrial Commission, and affirmed by the commission, they found (so far as here material) :

That applicant, Dorothy Lockhart, entered St. Mary's Hospital (hereinafter called "hospital") school of nursing on September 15, 1942, and continued as a student nurse until May 2, 1944; that in April, 1943, she became ill with a diagnosis of erythema nodosum; that a tonsillectomy was performed on her on April 15, 1944; that in April, 1944, she was informed that an X-ray report indicated a suspicious lesion of possible tuberculosis, but nothing definite; that the hospital informed her she could continue work or go to bed, and she continued as a student nurse until May 2, 1944; that she was a patient at the hospital from May 3, 1944, to July 21, 1944, and went home and returned to the hospital as a patient from September 16, 1944, to September 27, 1944; that sanatorium care was recommended in September, 1944, and on October 11, 1944, she entered the Wisconsin State Sanatorium (hereinafter called "sanatorium"), where a diagnosis of pulmonary tuberculosis was made; that she was a patient there until discharged October 10, 1945; that she and Margaret Wilkinson had worked together as student nurses in the hospital in March, 1943, and at that time Margaret Wilkinson was a highly infectious source of tuberculosis; that the applicant contracted pulmonary tuberculosis through contact with Margaret Wilkinson in the performance

of her duties as a student nurse of the hospital; that she had no tuberculosis training; that she was first told in October, 1944, that her tuberculosis came from her employment with Margaret Wilkinson; that since October 10, 1945, the applicant has not been able to work except on a split-shift basis with intervening rest periods; that *she sustained injury in the nature of pulmonary tuberculosis while performing service growing out of and incidental to her employment with the hospital* and the disease arose out of her employment by the hospital; that the date of injury was May 2, 1944; that application for adjustment of her claim for compensation was filed July 3, 1946; that the record herein is sufficient to establish that the *applicant did not know the nature of her disability and its relation to her employment prior to October, 1944;* that she ought to have known the nature of her disability and its relation to her employment *no earlier than* October, 1944; and that the filing of her claim for compensation (on July 3, 1946) was timely and the claim is not barred by operation of sec. 102.12, Stats.

Upon these findings the examiners awarded compensation to the applicant by the interlocutory order; and the Industrial Commission affirmed the award, and filed a memorandum opinion in which the commission stated:

"Applicant's last day of work was May 2, 1944. That constitutes the date of injury under sec. 102.01 (2), Stats. Application was filed on July 3, 1946, more than two years after the last day of work. Sec. 102.12 provides that regardless of whether notice was received, if no payment of compensation (other than medical treatment or burial expense) is made, and no application filed with the commission within *two years* from the date of the injury or death, *or from the date the employee or his dependent knew or ought to have known the nature of the disability and its relation to the employment,* the right to compensation therefor shall be barred."

The plaintiffs contend that in March or April, 1944, the applicant knew she had tuberculosis, and that it resulted from her work. On the other hand the applicant and the Industrial Commission contend that while she may have had a suspicion

or conjectured that she had tuberculosis as a result of her work, the fact is that she did not have reliable information and such knowledge as to charge her with the requisite statutory knowledge to require the filing of an application by her until October, 1944, and that therefore her application was filed within the required period, and was not barred in view of the provision in sec. 102.12, Stats. 1943, that,—

". . . Absence of notice shall not bar recovery if it is found that the employer was not misled thereby. Regardless of whether notice was received, if no payment of compensation (other than medical treatment or burial expense) is made, and no application filed with the commission within two years from the date of the injury or death, or from the date the employee or his dependent knew or ought to have known the nature of the disability and its relation to the employment, the right to compensation therefor shall be barred." [1]

As stated in *Larson v. Industrial Comm.* 224 Wis. 294, 297, 271 N. W. 835,—

"These provisions [sec. 102.12] were intended to cover cases where there might be some factual basis for ignorance of the character of the disability, and its causal relation to the work in which applicant was engaged. In nearly every accident case this will immediately be apparent, and the provision was directed primarily to cases of industrial disease where it was factually possible for some time after the onset of the disease for the applicant to be in doubt or ignorant, (1) as to what the disease was, and (2), whether it had in fact any relation to his employment."

As stated in *Trustees, M. R. Sanatorium v. Industrial Comm.* 224 Wis. 536, 541, 542, 543, 272 N. W. 483,—

"What an employee may think as to the nature of his disability and its relation to his employment is not alone sufficient to start the running of the two-year statute of limitations. To so hold would be to adopt an unthinkably harsh rule. What an employee thinks must be based on

[1] See memorandum on motion for rehearing, post, p. 422.

something more than suspicion and conjecture in order to start the running of the statute of limitations. Such thought must be based upon knowledge of, or upon reliable information regarding the nature of his disability and its relation to his employment. . . . In our opinion, the compensation law does not put upon an employee the duty of knowing the nature of his disability and its relation to his employment before those things are reasonably ascertainable by the medical profession."

Consequently, until the applicant knew or ought to have known the nature of the disability and its relation to her employment, her right to compensation therefor had not become barred under sec. 102.12, Stats., which was relied upon by the commission in awarding compensation to her.

The evidence in the record clearly establishes that the applicant contracted tuberculosis in the course of her employment as a student nurse at the hospital; that her tuberculosis probably came from her contact while working with Margaret Wilkinson in March, 1943, in the hospital supply room; that her last day of work was May 2, 1944; and that her application for adjustment of her claim was filed with the Industrial Commission on July 3, 1946. But plaintiffs contend there is no credible evidence to support the commission's findings that she did not know or ought not to have known more than two years prior to the filing of her application on July 3, 1946, the nature of her disability and its relationship to her employment; and they contend that she knew in April and May, 1944, the nature of her disability, and its relationship to her employment, is shown by the report of the hospital roentgenologist on an X ray taken May 30, 1944. In considering appellants' contentions in those respects there must be noted the following: There is no history of tuberculosis in the applicant's family before entering employment at the hospital, and when a pre-employment X ray was taken on July 8, 1942, it was interpreted as negative for tuberculosis. In working with Margaret Wilkinson for two or more weeks in March, 1943, from two to four hours

a day, they sometimes were side by side and sometimes opposite each other preparing supplies at a table down the middle of a small room. Miss Wilkinson had a severe cough and was raising sputum, and had been informed and thought she had laryngitis; on April 14th she became a patient of the hospital, and on May 29, 1943, entered Lakeview Sanatorium; and her condition on admission there was that of far-advanced pulmonary tuberculosis. On April 27, 1943, Dorothy Lockhart became ill and was confined at the hospital as a patient until May 2, 1943. She had painful nodules on her legs and pain in her joints, and her condition was diagnosed as erythema nodosum, which was not established during her confinement as tuberculous in nature. On April 30, 1943, and September 24, 1943, X rays of her chest were taken, and each was interpreted as negative. On April 4, 1944, another X ray was taken of her chest, and the hospital's roentgenologist reported that the picture was quite characteristic of an active *"minimal* fibrocaseous tuberculous lesion."
In April, 1944, the superintendent of the nursing school showed the applicant an X-ray report which indicated a suspicious lesion of possible tuberculous nature, but the diagnosis was not definite, and the superintendent advised her it was all right to go ahead with an intended tonsillectomy and that she might continue to work if she wished because it was possible that this shadow on her lungs might just disappear of its own accord, and if she wished she could go to bed and be on observation, and possibly on bed rest the spot would disappear more quickly. In April, 1944, she was under the care of Drs. Waddell and Sprague, and was not taken off work and continued to work until her tonsils were removed by Dr. Sprague. His notes of the first examination at the time of the tonsillectomy read: "Normal heart and lungs, except for X-ray report which shows questionable pulmonary pathology, probably on a T. B. basis." And Drs. Waddell and Sprague testified the tonsils would not have been removed if a diagnosis of active tuberculosis had been estab-

lished at that time, and they considered that the applicant's troubles were probably due to rheumatic fever, for which the tonsils were a possible focus of infection.

On May 3, 1944, the applicant re-entered the hospital as a patient for observation, and was still under the care of Dr. Waddell until July 21, 1944. At his request the hospital's roentgenologist re-examined the X-ray films made in September, 1943, and March and April, 1944, and reported that "The picture is quite characteristic of an active *minimal* fibrocaseous tuberculous lesion." Another X ray was then ordered in May, 1944, and interpreted by the roentgenologist in a report, dated May 30, 1944, as follows:

"Re-examination *reveals* the *infiltrations* in the periphery of the right second interspace anteriorly to have *decreased in size,* significantly. They also appear somewhat more fibrotic. The remainder of the lung fields are clear. Conclusions: *Receding* minimal tuberculous infection."

When Dr. Waddell saw that report he ordered a gastric test to confirm the probable diagnosis. It takes up to two months to get a report on a gastric specimen tested for tuberculosis, and the gastric-test report, dated June 22, 1944, indicated *positive laboratory tests for tuberculosis.* Dr. Waddell testified he did not know when the report came to his attention, and did not recall when he told the applicant about the result of the test, either in June or July. She testified that she first knew she had active tuberculosis after she was given the gastric-test report by Dr. Waddell, and the only testimony in the record as to when she was advised of the result of the gastric test is her testimony that she was advised about two weeks before July 21st that the gastric test was positive.

From October, 1944, to October, 1945, Dr. Schmidt, superintendent of the State Sanatorium had charge of the applicant. He testified that on the basis of the X-ray film of April 4, 1944, he would not diagnose pulmonary tuberculosis in her case; that the film alone suggests the *possibility*

of pulmonary tuberculosis, but does not prove it absolutely; and that if the physician who took that film thought it proved a diagnosis of tuberculosis, he would not have made the gastric specimens for proof. Likewise, Dr. Curreri testified that upon the basis of the April 4, 1944, X-ray film alone he would not establish a diagnosis of active tuberculosis; Dr. Dickie testified that the X rays of September 24, 1943, and April 4, 1944, would not establish a definite diagnosis of active tuberculosis. Thus at most the only information the applicant had indirectly was that the X-ray film showed a suspicion that she might have tuberculosis, but none of the medical experts considered the films sufficient to make a diagnosis of active tuberculosis.

However, because the roentgenologist's report of May 30, 1944, makes a diagnosis of "receding *minimal* tuberculosis," appellants rely upon it to establish that the applicant had contracted tuberculosis during the course of her employment and that she knew those facts. Appellants' contention in that respect cannot be sustained. Although the superintendent of nurses testified she handed and read that report to the applicant, it was not a definite diagnosis; it was but suspicious of minimal tuberculosis; and as the applicant testified, "There was a possibility I had minimal tuberculosis but it was indefinite. I was informed that the X ray of chest showed possible tuberculous lesions." As the evidence is undisputed that she never saw the X ray of May 30, 1944, and never was told anything about it or informed of the results thereof, it follows that it does not establish that she knew or ought to have known the nature of the disability and its relation to the employment. Moreover as there was Dr. Waddell's testimony that when he examined the roentgenologist's report of May 30, 1944, he did not make a diagnosis of active tuberculosis on that X ray, and also the testimony of Drs. Schmidt and Curreri and Dickie that the X ray of May 30, 1944, would not establish a definite diagnosis of active tuberculosis, and the testimony of the hospital's superintendent of nurses

that she believed she found out that a diagnosis of active tuberculosis was established in the case of the applicant on the last day of her confinement in the hospital ending July 21, 1944, it is clearly obvious that since the doctors could not determine positively that the applicant had active tuberculosis until they received the gastric report, she certainly could not have known it.

As she testified she was not informed of the source of her infection until she consulted with Dr. Maresh at Wisconsin State Sanatorium in October, 1944, and then first learned upon stating her history that her tuberculous condition was related to her employment at the hospital, and that her contact there with Margaret Wilkinson was the source of her tuberculosis, the Industrial Commission was fully warranted in finding that on May 2, 1944, she sustained injury in the nature of pulmonary tuberculosis while in the employment of the hospital; that the record is sufficient to establish that she did not know the nature of her disability and its relation to her employment prior to October, 1944; that she ought to have known the nature of her disability and its relation to her employment no earlier than October, 1944; and that the filing of her claim on July 3, 1946, was timely and her claim is not barred by operation of sec. 102.12, Stats.

The plaintiffs, in claiming that the applicant knew in April and May, 1944, the nature of her disability and its relationship to her employment at the hospital, rely considerably on what was written on two sheets of paper by an adjuster for the hospital's insurance carrier as purported statements by the applicant in a two-hour conversation with the adjuster. In relation to the purported statements as written by the adjuster, applicant testified that the adjuster did not report accurately all of the matters which were explained to him. That she stated that the X-ray report of April 4, 1944, showed that the diagnosis was minimal tuberculosis, and that it was not a definite diagnosis but he did not write it all down as she stated. He wrote a part of it, but it was incomplete;

and what is there are not the exact words she gave and it does not read the same as she said it. That a great deal of information given to the adjuster was information which the applicant knew in 1946, but did not know in 1944. When questioned regarding her application for compensation filed in July, 1946, she told what she knew then; that she had been told it was a suspicious X ray but until she went to the sanatorium in April or March of 1944 she did not know it was definitely tuberculosis, which was later confirmed. She did not say that when she was told that she had tuberculosis in March, 1944, she thought then that she had contracted this tuberculosis as the result of her work at the hospital, and she did not say that she knew in March and April, 1944, that her tuberculosis was the result of her work at the hospital in Madison.

In view of the applicant's testimony as to the extent and manner in which the adjuster purported to write what she had stated, it was within the province of the examiners to consider the purported statements as written by the adjuster to be so inaccurate and incomplete as to be of little consequence in so far as they are in conflict or inconsistent with the applicant's testimony at the hearing upon which the issues were decided by the examiners and the commission. To her statements to the adjuster and also in some of her testimony as to what she knew about her physical condition at various times during the course of the developments therein which finally resulted in her ultimate disability and incapacity to work, there is applicable in her case,—as there was in *Trustees, M. R. Sanatorium v. Industrial Comm., supra,* page 542,—the conclusion that due consideration of much of what she stated expressed her thoughts at subsequent times rather than the thoughts she had prior to October, 1944.

The statement in item No. 9 of the applicant's application for compensation filed in July, 1946, which reads, "Notice of injury given employer—on April (or late March) in the following manner: Was informed that X ray of chest showed

tuberculous lesion," cannot be deemed or construed to impair her right to compensation. It does not appear whether that statement relates to the April or March, 1943, or 1944 X-ray films. As to the films taken in April, 1944, the applicant was not informed then that she had tuberculosis. The only information she was given then was that·they were suspicious of tuberculosis.

*By the Court.*—Judgment affirmed.

The following memorandum was filed September 6, 1950:

FRITZ, C. J. (*on motion for rehearing*). In lieu of the citation of sec. 102.12, Stats., and the statute quoted in connection therewith in the opinion filed on June 30, 1950, said portion of the opinion is corrected to read:

". . . sec. 102.12, Stats. 1943, that,—

". . . Absence of notice shall not bar recovery if it is found that the employer was not misled thereby. Regardless of whether notice was received, if no payment of compensation (other than medical treatment or burial expense) is made, and no application filed with the commission within two years from the date of the injury or death, or from the date the employee or his dependent knew or ought to have known the nature of the disability and its relation to the employment, the right to compensation therefor shall be barred."

*By the Court.*—Motion denied with $25 costs.